and be seated. And with that, we'll call the first case of the day, which is Creative Vision Resources v. National Labor Relations Board. And first, we'll hear from Mr. Jacob. Good morning, Your Honors. Let me introduce my co-counsel, Amanda Goldman, if I could. And let me thank you for the opportunity to present our case to you today. Your Honor, there are But with the time we have, we can see two that we really ought to focus on. But let me just tick off the seven. If I had more time, I would talk about them all. The necessity of a union bargain demand. The hiring. When does hiring occur? Third, what is adequate communication of new terms and conditions of employment? Four, what is the legal test for the perfectly clear exception? Five, there is a critical credibility resolution. I never thought I'd be arguing on credibility resolution to an appellate court, but there's one that's crucial in this case. A sixth one is the sourcing of hoppers. And the seventh one that we see in the case, of course, is whether the complaint was invalidly issued under the Federal Vacancy Reform Act. We're going to focus on two issues primarily. The first is when did hiring occur? And the second, what is the, whether the communication of the terms and conditions was adequate to make this a successor, an ordinary successor? We have handed to the Court two charts that we think will be helpful in trying to determine when the hiring occurred. And the NLRB erred significantly in this case when it held that the hiring actually occurred on June 1st, the day before operations began. And the difficulty with that is that Creative Vision had no way of knowing on June 1st who was going to accept employment when it started the next day. No one had chosen to work for Creative Vision. They tried to start on June 1st, but they didn't accept the new terms. They continued to source hoppers to work. And when you get to June 1st, all of a sudden the NLRB says, well, that's when the bargaining obligation accrues. And by that day, nobody had accepted employment yet. Significantly, this Court, and it was Judge Wisdom, I believe, and Admiral Maintenance, held that until the workforce is actually assembled and in that case, operations began, and then a couple of days went by, and that's when the new terms were announced, and that's when there was an assembly of the workforce. There was no assembly on June 1, and Admiral Maintenance is strong authority for the fact that you have to have operations when people can choose to work or not choose to work. Now, an interesting question. Why would the NLRB take a typical hiring date, which really occurred on June 2nd, but back it up one day? If you look at the chart, if you look at the two charts and put them next to each other, you can see that the bargaining obligation accrued the day before on June 1st, but then look at the Spruce Up case, which is the seminal case for the National Labor Relations Board. If creative vision had been the authority for Spruce Up, then the bargaining obligation wouldn't have occurred until April 14. It would have actually occurred on March 2nd. If you're going to back up one day from when operations began, when this really ambiguous idea of an intent occurs, then you'd have to overrule the Spruce Up. And frankly, I believe that creative vision sub salentio overrules Spruce Up, because Spruce Up holds to the proposition until there's a substantial and representative compliment, there's no bargaining obligation. And there was no substantial and representative compliment on the day before the hiring occurred. Counsel, you seem to be emphasizing this assembly, the 0400 on June 2nd. You've got about a hundred applications. About 70 completed applications, I think it is, on June 1, and that's when the Berry 3 contract was canceled. I'm not saying this is metaphysical. I mean, there is a precise event that we need to be looking at. I'm not familiar with Judge Wisdom's opinion. I'm certainly not familiar with his reputation. But what you have other than that to say that it's the assembly of workers in ODARC 040 or whatever it was on June 2 that is the actual date of employment that we need to worry about? I mean, that's what courts have held. For example, the bank note case from the Second Circuit. That court held that the bargaining obligation accrued when operations began. And so there is authority that the hiring, when is a substantial and representative compliment hired? When is it hired? And if you look at the Spruce-Up case, that didn't occur until April 14. Now, here's one reason why it can never be June 1. What if on June 2 those employees did what the employees in Spruce-Up did and went out on strike? The employer tries to start on June 2. It makes an announcement to all the employees what the terms and conditions are, and the employees say no way, and they go out on strike. Then that explodes the June 1 hiring theory of the NLRB. In this case, the substantial and representative compliment for Spruce-Up didn't occur until the employees gave up the strike almost a month and a half later on April 14. Now, why is this important to the case? Why would this hiring date be important to the case? It's inextricably tied to whether the communication of the terms was adequate or not. Because if June 2 is the date that the substantial and representative compliment was hired, if June 2 is the date, then that totally explodes the NLRB's argument that there was inadequate communication. Why is that? Because before operations began on June 2, the company, Creative Vision, announced to the 70-plus Hopper applicants that were there all the new terms and all the new conditions. That meets the NLRB's test in Spruce-Up. If you look at Spruce-Up, it uses the word before operations began or simultaneous. Simultaneous is in that decision. So that's why the NLRB had to back it up one day, because that would totally make them lose on a perfectly clear exception argument. When you back it up one day, then they can play in the ambiguities of how much communication went on before, you know, from mid-May until June 1. But where do we stand? I mean, this was some years back now. Is the union representing the Hoppers today, or is there still an issue? I mean, it seems like a lot of time has passed, and maybe all this has been taken, by time it's been taken care of. The union is the representative of the employees. This is simply over whether we have a back pay liability for putting in our new terms and conditions, which the Supreme Court said in Burns and Falls River, we have a right as a successor to implement our new terms and conditions. So this battle isn't over whether we're going to successfully implement our new terms and conditions, which the law, the Supreme Court has said we have a right to do. So did the effect of this change reduce the income that the Hoppers were making when you went to an hourly wage versus a contract worker for a set amount? It did a little bit. This was a rogue employer who had been treating — had not been honoring the collective bargaining agreement, had been treating the employees as independent contractors, was withholding no child support, no federal taxes, state taxes, Social Security, was not paying any overtime. Creative Vision went to an $11 an hour, you know, with overtime, with all the requisite deductions and such. And, of course, one of the reasons they did that is they thought — they worried that they could get hit with some kind of a joint employer liability if they had continued with this rogue employer. The Berry Three is who it's referred to in the briefs. So how much money are we talking about now? Is that still up in the air? I estimate around $40,000. This is a small, minority-owned business. It's a 36-year-old individual who went into business. He worked for Richard's Disposal. He saw the way these hoppers were being treated. He started a labor force to try to treat these fellows correctly and properly. And these are individuals who can't get a job anywhere else. They couldn't get a job at McDonald's. They've got criminal records. He's hired them, and they work as hoppers on the garbage trucks in this city. Let me move to a second point on the adequacy of the dissemination or the communication. They reversed the — one other point. They've maintained — the NLB maintains that they didn't reverse the ALJ, any findings of fact. Well, they absolutely did reverse the ALJ. The ALJ held that the hiring didn't occur — a substantial complement didn't occur until June 2nd. The ALJ held that. The NLB reversed him and said it occurred on June 1st. But as far as the dissemination, the ALJ also found that there was adequate dissemination. There was widespread dissemination. And when you look at the evidence that was there — Counsel, you don't have much time. It does seem to me that what the government, what the board is arguing is that the dissemination the ALJ was saying was adequate. We're saying it's not, that you need something more specific than getting it out to 20 people and letting by rumor and otherwise the information make it to a larger group. It seems to me that is at least the argument why the fact finding wasn't overturned. Regardless of that, what do you make of this? Is that what we're dealing with, that 20 were told and word of mouth among the very three employees is what got it to the rest of the individuals? We're dealing with really three things. First, there were — Alvin Richards, whose testimony was found to be sincere, meticulous, a stickler for detail, solicited 20 hoppers. We then brought in — there were six or seven hoppers who testified. Every one of the hoppers, six of those hoppers testified that they knew about — two of them said they knew about it before operations began. Another one said they learned of it the morning of the operations. One hopper said every — there were only 44 people here. Everybody knew what the new terms and conditions were. Well, is there a case law that supports the point that word — if it's adequate for an employer to get word out in that way? Yes, there is. And we sent that case to this court last Friday. It's Cedar Transport of America. And in that case, the board has specifically held that an employer communication can have legal effect even if it's just up to almost half of the workforce, and it's imputed to the rest of the workforce. And there's an example of a really understandable understanding how a workplace operates, because employees talk about everything in the workplace. And that's what happened in this workplace. Anthony Taylor, one of the hoppers, specifically said, we all knew what the new terms were. We all have been talking about it. Well, one thing I may have to worry about that factually is that my understanding of the facts on June 2 is when that 4 o'clock meeting occurred, several of the people there refused to accept the new terms, perhaps having them fully explained to them for the first time. So that sort of cuts against the word of mouth being adequate. Well, there were employees — go back to May 20th. On May 20th, employees didn't accept as well, too. So, I mean, there was always — and why didn't they accept? They liked getting a full paycheck with no deductions. Yeah, but the main point is that they also reduced the pay. Never mind the deductions. That was a problem, but they reduced the pay. Yes, Judge King, the pay did — That was not good. It was a double whammy, right? It was — they were operating legally for the first time, but the pay did get reduced with a new down on June 2nd, or even go on strike, as they did in Spruce-Up. You know, how can you say that everybody had made the decision on the day before? I'd like to move, just with my limited time, to the bargaining demand argument. We'd like to cite — there's another circuit court case on the necessity of a union bargaining demand, for the perfectly clear exception to apply. It's International Association of Machinists and Aerospace Workers v. NLRB. It's a 1978 case. On page 675, footnote 52, it's the D.C. Circuit, which held that absent a bargaining demand by the union, the successor can simply institute the terms on which the employees were hired as the beginning of terms of employment. And that was a case that predated Fall River, and it was based upon a reading by that court of the Burns decision. I think that's it, Counsel. Thank you, Your Honor. Isabel, what do you have to say? May it please the Court. Let's start with actual hiring. There is no clear successor to have actually hired the predecessor's employees before the obligation to bargain kicks in. What Burns talks about and what Spruceup talks about is your intent to hire. Once you intend to hire those employees, you can avoid perfectly clear successor status by making it absolutely clear to those employees that you've got new terms and conditions of employment. Isn't that reversing the Spruceup, though, rule? It's supposed to be perfectly clear that the rules are the same, not perfectly clear that the rules are different. Correct? Well, you have to make it clear. Your perfectly clear successor, if it's perfectly clear to respective employees that it's the same deal that was in existence prior to the new exception. I think that's what Spruceup says. You have to make it perfectly clear. I wrote it down here. Clearly announce your intent to establish a new set of conditions. If you just let the employees believe, either actively or inactively, that their job conditions are going to be exactly the same, then you're a perfectly clear successor. Then you run into what the D.C. says. If you run the employees into a false sense of security, you have engendered expectations that their jobs are going to be exactly the same. They're not going to look for another job. And let me just say very quickly, there is nothing in the record that these hoppers are unemployable by anybody else. Absolutely nothing. Some of them did leave, and some of them did take other jobs at Metro transportation or Metro disposal. So I don't want that to go unchallenged. Under Spruceup, you have to declare prior to or simultaneously with the invitation to employment, not the actual hiring date. Once you decide you're going to hire, and there is no question in this case that Mr. Richard intended to hire every single hopper to work for Barry 3. Once you've decided that, and you know what your new terms and conditions of employment are, you need to let them know. That's it. That's all the board requires. Tell them. You can tell them. You can tell the union. There was a union in this case. One phone call, and you're done. What you can't do is tell 20 of them and leave 50 more to figure it out on their own. That's not acceptable. That leaves you in the IAM situation where you're engendering expectations. Under Canteen Court, for example, in the Seventh Circuit, the court agreed with the board that merely handing out applications without telling the employees something was changing, that starts your bargaining obligation. You don't have to wait until the first day everybody shows up to start work. You know Mr. Richard knew he was going to take over this contract with Barry 3. So there was no question about that. He also knew he was going to hire the Barry 3 hoppers. So let's discuss, if I may for just a second, the May 20th date. There's been a lot of implication that on May 20th the Barry 3 hoppers just would not accept these terms, so we had to go elsewhere. There's nothing in the record that a single outside applicant was solicited or accepted employment or filled out an application. Nothing. The only person they cite to this record is Mr. Flagg Jr., who was in jail. So his father gave him an application while he was in jail because it helped him be released. Mr. Flagg Jr. was an employee of Barry 3 before he was incarcerated. There is no evidence in this record that any hopper who had not worked for Barry 3 was solicited or given an application or filled out an application. Mr. Richard gave out applications prior to May 20th. He gave out 20 of them. It wasn't enough. At that point he solicited his friend, Mr. Flagg, to pass out more. That's when they got 70. Was Flagg told or in turn did he tell that there was a change in the rate of pay? The record is clear and the ALJ credited Mr. Flagg's testimony that he was not told and he did not tell anyone. The hoppers who testified, I think it was Mr. Booker T. who testified that he learned, he got the application from Flagg and was not told about the change. So what the ALJ found and the board agreed, there were 20 who were told and 50 who were not. And that is simply not enough. It's the employer's obligation to tell the employees. Obviously by May 19th or 20th he knew what his new terms and conditions were going to be. All he needed to do was tell the employees. Counsel, let me ask you about this language from Burns as interpreted by the board itself, which gets to my point. It took me a while to find it, but I think you have it backwards. The caveat in Burns should be restricted to circumstances to which the new employer has either actively or by tacit inference misled employees into believing they would all be satisfied with their wages, hours and conditions, or at least through circumstances where the new employer has failed clearly to announce his intent to establish a new set of conditions. So it seems to me that there are two different things going on there. One is that the real clear exception requires clarity to the old employees, the current employees, I guess, that may be new employees, that they will, they can't be misled into thinking everything is going to remain the same. And it seems to me that what the board is focusing on is that there may have been some ambiguity, that not enough people were told, you're talking about the 20 number and how much further did that go. So your understanding of the exception, and I think it may be challenged here, not by me, I mean, but by counsel on the other side, is that unless the employer makes it, prospective employer, perfectly clear that everything or some things will be changed, that they are bound to bargain with the union. I guess I don't understand your distinction. So it's my... Well, what has to be clear? Clear there's going to be a change or clear there's not going to be a change? I think it has to be clear that there has to be a change. I mean, if you do nothing, you are making it clear in a sense that there's not going to be a change. You are inactively telling employees everything is going to be exactly the same. If you tell them everything is going to be exactly the same, you're a perfectly clear successor. If you tell them everything is not going to be exactly the same, you are not a perfectly clear successor. So clarity seems to be the focus and we'll have to figure out exactly what it means here. Now, I can tell you that I have not been able to find any board or court case that allows word of mouth, rumor, gossip to take care of the employer's obligation. Employer's obligation, yeah. It is the employer's obligation to tell the employees. And there was no ambiguity on Mr. Richard's part here. I mean, he knew what initial terms and conditions of employment he wanted to start with. We don't have an employer who's sort of trying to figure it out as he goes along. He knew because he told some people and not the others. So if the start date for us in employment, if we decide that's June 2 rather than June 1, where are you? Well, to do that, you would have to decide against Spruce Up and other court cases that actual hiring makes the difference. Okay, but I know your argument. Where are we if June 2 is today? If you decide that June 2, I mean, they announced what the new terms and conditions of employment were right before everybody got on the trucks. So by doing that, you're letting them wait until everybody has engendered expectations and been lulled into a false sense of security. Remember, this is we... Okay, you haven't, I don't know if that's the response or not. Let me make sure what you're saying. The 4 o'clock, 4 a.m. meeting, the new conditions are announced and you have some people decide I don't want to do that and walk away and don't get on the truck. Burns and Spruce Up, that's before the work started, they announced. So it really doesn't matter in your view, June 1, June 2, they lose either way. They lose either way, but I don't think that is consistent with Burns and Spruce Up. Both talk about before you start operations. All the cases talk about your obligation. That's the whole point of the perfectly clear successor exception. Your obligation starts before you start operations. If you wait until you start operations, it's too late. You should just let them know. You wait until June 2. Everything's already started. Creative hired a supervisor on June 1. They canceled the contract with Barry 3 on June 1. All the hoppers were employed by Creative, excuse me, on June 2. By then, operations have started and what the board says and what the 7th Circuit in Canteen says and the 6th Circuit in DuPont-Dowell say, you can't wait until post-hire. You've got to tell them before that. That's the only obligation here. Just be clear and let them know. The argument is June 2 isn't post-hire, 4 o'clock is pre-hire. They showed up to sort of get the story. June 4 was a regular work day. That day, everybody who showed up, assuming they needed them because there's only two hoppers that go on every truck, was going to be working for Creative. There's no question on June 2, if you show up, you're getting on a truck for Creative. Or not working. Or not working because they only needed 44. This is not a small, cohesive group of 44. Remember, they got 70 applications because not every hopper works every day. Some show up, some don't. What Mr. Richard agreed with his father was that he would not cancel Barry 3's contract until he was sure he could supply all the hoppers. And to do that, he set a goal of 70 completed applications. Every one of those came from Barry 3 hoppers. He only needed 44 that day, but that does not mean he only employed 44 because the next day, he might have needed 50 or five different people showed up. But all of those people were prior Barry 3 employees, and they all worked for Creative on June 2. So I think we've talked a little bit about credibility. We've talked a little bit about the ALJ reversals. The board certainly didn't reverse any of the board's credibility findings. It did draw different inferences from them. The ALJ agreed that Mr. Flagg didn't tell the 50 people he solicited applications from, so we know that at least 50 did not know. There were a couple of hoppers who testified that they learned about it beforehand, but it was unclear from the testimony if they meant beforehand the 4 a.m. meeting on June 2 or truly beforehand. But in any case, the ALJ was very clear that it is a mystery how many people heard about it before, other than the 20 who were actually told by Mr. Richard. And that was the ALJ's finding. It's a mystery how many heard about it word of mouth. And the board said that's not good enough. And I don't know of any case that allows that. The student transportation case, as we said in our letter, is actually about threats in an election context, which is a very different kind of situation. The court has another case pending. Adams & Associates, I believe, was argued recently. I haven't looked at that case, but is that case, does it cover the same basic stuff that this one does, or what's the drill? It's very similar. It was not my case, so let me try to remember. It is very similar, except there is different evidence about what the employer told the employees prior to starting. So there was actually a meeting with all employees, and the employer said something in that meeting. And the dispute is whether or not that took him out of the perfectly clear successorship. But in that case in Adams, there was one meeting with all or most of the employees, and he said something. So that's what the dispute is about. What did it mean, what he said. But it is a perfectly clear, and there's some 883 firings because he didn't want the union. So in that way, it's different. I mean, there's no allegations like that in this case. What about the tax forms? At least one member of the board thought that in itself would be enough to pass on the necessary information that the conditions were changing. What's your analysis of them? Well, a couple of things. One is you can't just hand out a form and expect the union to figure it out. And as we said, at least some, a fair number of employees wrote N.A. on them, didn't fill them out, which indicates that they didn't actually know what was happening. I think, we called them. Well, I mean, what did the ALJ say about the tax forms? The ALJ said that that was an indication, they should have known that their terms and conditions of employment were going to change. Well, the point, I think, at least the member on the board, maybe ALJ too, is that this shows they are no longer getting tax-free money. And your response is it doesn't necessarily tell people with this education level and whatever else much of anything. But you do have a fact-finding from the ALJ to the contrary. Well, we have a legal conclusion. They should have known, right? The fact-finding is that they were handed out. Nobody disputes W-4s were handed out. What we don't know from the record is if they were also handed out by Berry 3. We talk about these hoppers as independent contractors under Berry 3, but there was, it's clear from the record that there is no legal finding that they were independent. They were not legally independent contractors as we would understand it at the NLRB. They were a certified unit of employees. So the board certified the union, which means that in 2007 the board was not asked to make them independent contractors and in fact found them to be employees, which it wouldn't do. It sounds to me that the point is they were treated as independent contractors. The only sense I can, that's explicit, is Mr. Berry didn't deduct taxes. I'm sorry, I didn't hear you. Is that Mr. Berry did not deduct taxes from their wages. So whether or not he supplied them with safety vests or any other kind of, they had a supervisor, they were employees. In that way the only explicit finding is that he just didn't deduct their taxes. So we don't know if they filled out W-4s before or if he made them fill out W-9s. And I don't know if I would know five years before the difference. You know, filling out a W-9 versus a W-4, what's the real difference? I don't know if it would have occurred to me over a few years. So there is, the issue is that it is a form that the court set in DuPont Dow, the Sixth Circuit. You just have to be sufficiently clear and definite to let them know. And giving somebody a form to fill out where a goodly number of them write N-A on, in the applications some of them filled out their names and address and signed them back and that was it. Some of them filled out their educational status and listed some references and others didn't. It was a pro-form of filling out. When you fill out, I've forgotten this, I should know, when you fill out one of those forms, does it show what you're being paid? It doesn't. No, it just authorizes taxes to be deducted, right? Yes, Your Honor. So there's two things that needed to be disclosed here. One was that the rate of pay was going down and the other was that we're going to start withholding. So handing out a W-4 deals with one of those things but it doesn't deal with the other, right? Yes, Your Honor. Okay. Well, do you accept that both had to be shown or is it just enough that the employee showed there would be changes in conditions? Well, I think what the board said is you have to show enough that they know. I mean, it would be easy enough on this record for him to tell everyone that their wages are going to change. I mean... Well, I guess I'm just asking what the law is here. I thought the point was on perfect clarity. If it's perfectly clear there are going to be some changes, that exception doesn't require that all the changes be shown. I don't think it requires that all the changes be shown. But you have to be sufficiently clear and definite that something important is going to change. I mean, I think it was in DuPont Dow where the employer said you're going to have comparable benefits and wages. And the court said that's not... And then they made some very significant changes. So telling them it's going to be comparable, the court said, you need to give some kind of indication where employees actually know or should have known that something important was going to change. Well, but something important, there's two things here that are important. And would it be enough to simply say, we're going to start withholding on you when the other big changes were reducing your hourly rate considerably? And that's an interesting question. And we didn't brief it and, of course, the board did not discuss it. And I think there may be a split in the circuits about that. I mean, I think the D.C. circuit, for example, has required...doesn't require as much specificity as perhaps the Seventh and the Sixth circuits do. And the board didn't discuss that in this case because what it actually found was that there just wasn't good enough notice about anything, taxes or wages. And remember, the taxes are going to continue to come out. There's no restoration remedy in that case. I mean, that's a legal requirement. The board has not taken away. I have one more minute. Bargaining demand. There is no requirement that there actually be a bargaining demand in a perfectly clear successor situation. Banknote in the Second Circuit is extremely clear about this. Fall River, the court discusses the Burns successorship situation and says the triggering fact for the bargaining obligation in Burns was the composition of the union. So if you're hiring all those employees, you've got a bargaining obligation. There's no question. In Fall River's situation, the reason you go through substantial and representative complement and substantial continuity of operations is because in Fall River, you don't know how many employees you're going to hire until later. And then there's a question about the union's majority. In a Burns ordinary successor, perfectly clear successor situation, there is no question that the union has a majority. So the union does not have to demand bargaining. If there are no further questions, thank you, Your Honors. Thank you. Jacob. Just a couple of points in rebuttal. The ALJ held specifically, based on credited evidence, Creative Vision Resources was an ordinary successor because it communicated its intent to pay an hourly rate in overtime and withhold taxes well before it began operations. That was the ALJ's finding. The NLRB reversed that. They said it was simply an inference. To me, that's the critical issue here. And they reversed the ALJ on a critical issue. And that's what's unique about this case. Most cases that come up from the NLRB, the respondent has lost before the ALJ. He's lost three zip or she has lost three zip before the board. And so they come to you with a very dirty record in that sense. In this case, the ALJ ruled in Creative Vision's favor. The panel split with a very strong dissent against the finding that Creative Vision met the perfectly clear exception. And really, what's the import of the decision here? It's a very simple decision. It's that Creative Vision had an obligation and a duty to bargain before it ever knew it was going to be able to go into business. That's what they're arguing. Creative Vision had a duty to bargain before it ever knew it would be able to go into business. Let me say one thing, too, about Flag versus Alvin. And this is a serious credibility resolution. Alvin Richard was found to be a meticulous, sincere, detail-oriented, and his testimony was that when he passed out the applications, he told everyone what the terms and conditions were, including the pay. Well, that had to include Flag, who he enlisted. And he also testified, and this was credited, that Flag came back to him and asked him several times to confirm what the terms and conditions were. It's also credited that Flag said he had a bad memory. Now, how this case, and I believe it's the dynasty deal case in 2007 versus NLRB, it held that a credibility resolution cannot be upheld where it's self-contradictory. And so it is impossible for Flag to be credited with having said that he never knew what the terms were, Richard's never told him what the terms were, and at the same time credit Richard's with meticulous attention to detail and sincerity telling everybody what the terms and conditions were. And let's see, one other thing to the, counsel argued that you shouldn't accept the U.S. Chamber of Commerce's brief on this case, in which it sets forth, you know, the spruce-up test that it needs, you have to have a tacit, either active or tacit misleading, or a failure to disclose. It made the argument that Creative Vision did not argue that in its brief, and that's absolutely wrong. If you look on pages 29 and pages 45 and 46 of our brief, we actually did make that argument. And the U.S. Chamber of Commerce did a very excellent argument in showing how this ambiguous concept of intent to retain has no authority supporting the ability of the U.S. Chamber of Commerce to do so. And that's why we're not supporting it when compared to the requirement of a substantial and representative complement being hired in the workforce. Because if intent was really what the trigger was, look at the chart in the spruce-up case. That would push you all the way back into early February, because in spruce-up, the successor there clearly had an intent from the very beginning. So you see it's an amorphous standard. And it gets very tough for a company like Creative Vision. According to the NLRB, on June 1st, on June 1st, Alvin Richards should have realized that he needed to pick up the phone and call the union and say, oops, I don't have enough, I've got a bargain. He'd have to go out the next morning and tell all the hoppers that, I'm sorry, what you've heard about the new terms and terms of negotiations with the union, it's not a practical result or practical guidance coming from the NLRB in this particular instance. Mr. Jacob, with apologies to my colleagues here, I want to push you just a bit past the deadline here. It seems to me to rule in your favor there'd be some new law being made here, which may be appropriate, it may be consistent, and I want you to respond to that. And I think the new law is that giving to employees the obligation, at least relying on employees, to spread the word, future employees, spread the word about the new conditions, is not supported by current case law. There's no case law one way or the other, but, well, there is case law. You have to take a step back because we know that there is case law that when an employer speaks to one half of the workforce or almost one half, it's imputed to the rest of the workforce. Now, if that's true in one context, why isn't it true in this particular context? The other thing, too, is that there were three decisions that came down last summer. You referenced one of them, Judge King, the Aladdin case, there's the Creative Vision case, there's the Nexio Solutions case. That was originally lodged in this court, but because of the fight between the circuits, it's now out in the Ninth Circuit. All three of these are setting new boundaries and new guidance on the successorship and the perfectly clear doctrine. And the NLRB has never liked the Burns case. If you go back before Burns was the law, an employer had to accept the existing terms and conditions of employment that were there. Burns allowed the employer, as an ordinary successor, to set the initial terms and conditions of employment. This is an exception, and the NLRB keeps trying to widen this exception until it subsumes the actual right of a successor employer to set its initial terms and conditions of employment. Thank you, Counsel. Thank you, Your Honors.